UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

INTERNATIONAL GROUP, LLC,

         Plaintiff,      11-CV-6622 CJS

  -v-

DANIEL PADILLA,[1] RICHARD WELKOWITZ,
BLACKFORD DEVELOPMENT LTD., LAKE
CITY MOB ASSOCIATES, LLC, SARNO ROAD
ASSOCIATES, LLC, LAKE CITY MEDICAL
ASSOCIATES, LLC, ABC CORPORATION,
XYZ CORPORATION,

         Defendants.
_____

APPEARANCES

For Plaintiff:      Steven M. Witkowicz, Esq.
          Handelman, Witkowicz & Levitsky
          16 E. Main Street, Suite 410
          Rochester, New York 14614

For Defendants:     Richard J. Evans, Esq.
          Evans & Fox, LLP
          95 Allens Creek Road, Suite 300
          Rochester, New York 14618

INTRODUCTION

   This is a diversity action alleging claims under New York State law for conversion and slander of title. Now before the Court is Plaintiff's motion for leave to file a second amended complaint (Docket No. [#9]) and Defendant's cross-motion to dismiss and/or for summary judgment [#14]. Plaintiff's motion is denied, and Defendants' motion to dismiss is granted.

---

[1] Padilla has never been served in this action, and the time for serving him under FRCP 4(m) has expired.

BACKGROUND

The following facts are taken from the Amended Complaint and proposed Second Amended Complaint, including any documents which are attached thereto, incorporated by reference, or integral to the pleading,[2] and are viewed in the light most favorable to Plaintiff. International Group, LLC ("Plaintiff") is a company that provided charter flight service on a private Gulfstream jet aircraft. The jet was owned by a separate corporation, International Group, Inc., which is not a party to this action, but which has assigned all of its rights concerning the subject incident to Plaintiff. In or about September 2010, defendant Daniel Padilla ("Padilla") and defendant Richard Welkowitz ("Welkowitz") embarked on a business venture, that involved Padilla traveling to the African nations of Mali and Benin to obtain gold to bring back to the United States. Welkowitz allegedly funded the venture, by paying approximately $6 million to persons in the nation of Benin, including Desire Vodonou ("Vodonou"), a member of the Benin Parliament, to process the necessary customs paperwork. In connection with this venture, Welkowitz's company, Blackford Commodities Company LLC ("Blackford Commodities"), contracted with Padilla's company, Greystone Aviation, LLC ("Greystone").

The contract between Blackford Commodities and Greystone provided that Greystone would be responsible for transporting the gold from Africa to the U.S. via an unnamed "private charter plane." Greystone subsequently chartered Plaintiff's jet for the

---

[2] In considering a 12(b)(6) motion, the Court is generally prevented from considering matters outside the complaint, although, the complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *but see, Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.").

round trip to and from Africa.  Apart from providing such transportation, Plaintiff had no involvement in the arrangement between Blackstone Commodities and Greystone.

In Africa, the venture unraveled when Padilla was arrested and imprisoned, along with Plaintiff's flight crew, on suspicion of fraud involving the gold transaction.  Specifically, this occurred on or about December 23, 2010, in Benin, in the capital city of Cotonou.  On January 4, 2011, Benin authorities impounded the jet, purportedly because they believed that it was owned by Padilla.  In that regard, Padilla allegedly represented "to his local contacts" that he was the jet's owner.  Several days later, Benin authorities released Plaintiff's crew, but not the jet.  On January 31, 2011, Benin authorities determined that the jet should remain impounded as evidence, since it was used in the commission of a crime.

Shortly after the jet was impounded, Plaintiff's insurance company began efforts to obtain the release of the jet.  In connection with those efforts, Plaintiff learned of the agreement between Blackford Commodities and Greystone, and of Welkowitz's ownership of Blackford Commodities.  On February 11, 2011, Plaintiff's insurer advised Welkowitz's representatives that the jet was owned by Plaintiff, not Padilla, and that Welkowitz should not interfere with efforts to obtain the release of the jet.

On February 21, 2011, Plaintiff wrote to Welkowitz, and indicated that it considered him to be the "Principal" of the failed gold venture, and that it was looking to him for payment of its costs associated with the seizure of the jet, which it estimated at approximately $3 million.  Welkowitz did not respond.

On or about February 24, 2011, Welkowitz, along with one of his African advisors, Nelson Mandela's grandson, Amuah Kweku Mandela, wrote to the President of Benin, who is apparently also the "Chief Magistrate" of Benin, and threatened to take legal action

against Benin in "the highest international legal institutions," due to the handling of the fraud case against Padilla and Vodonou. The letter indicated that Welkowitz and Mandela, along with more than one hundred other people, were the victims of "a scam" by Vodonou and Padilla, and expressed "suprise and amazement" that Vodonou was not being prosecuted. In pertinent part, the letter also urged the President not to release the jet:

> The private jet was seized by the courts and is currently detained on the tarmac of the airport . . . in Cotonou. If the private jet used to carry out the plan which is tangible evidence in the record were to be released while the arrests and prosecutions are still ongoing and the accused are not yet judged, the case would lose its value to our prejudice as would the release of [the] accomplices of Desire Vodonou[, . . . ] Daniel Padilla and Benjamin Gandonou who have confessed and are already in prison asking to be released.

Docket No. [#3-1] at pp. 5-6. According to Plaintiff, this letter "knowingly and fraudulently lied about the ownership of the aircraft and the fact that the flight was not operated as a private flight but instead was operated as a non-scheduled commercial charter under plaintiff's US Air Carrier Certificate." Amended Complaint ¶ 30. The Court, though, sees no such representations in the letter.

On February 25, 2011, a Beninese court ordered that the jet be released. However, Welkowitz appealed that order, as a result of which, the jet remained impounded pending appeal. Amended Complaint ¶ 32.[3] The Amended Complaint contends that in the appeal,

---

[3]While it does not affect the Court's ruling, the Court notes that, according to Plaintiff, Welkowitz knew that Plaintiff had no involvement with Padilla's scheme, and that the only reason Welkowitz filed the appeal was to gain a bargaining chip, in the hope that he could persuade Plaintiff not to pursue legal action against him. However, according to documents submitted by Plaintiff, Plaintiff's insurer indicated that Welkowitz filed the appeal because he believed that Plaintiff was partly at fault for the failure of his business venture with Padilla. *See*, Marchionda Aff. Ex. G at p. 2 ("Mr. Welkowitz apparently believes that International Group's failure to obtain proper permits, or association with Mr. Padilla, has caused his loss."). The insurance company further blamed Plaintiff for the continued detention of the jet, since, without the insurer's knowledge, Plaintiff sent the aforementioned threatening letter to Welkowitz, prompting his appeal, after the insurer had

Welkowitz "*again* lied about the ownership of the aircraft and the nature of the charter, whether commercial or private," meaning that he lied both in the prior letter and in the appeal. *Id*. (emphasis added). The document which Plaintiff identifies as this "appeal" is contained in the record at Docket No. [#16-2] at pp. 3-6, Marchionda Aff., Ex. E. This exhibit is incorporated by reference into the Complaint, and the Court therefor may consider it in ruling on a 12(b)(6) motion. In that regard, the exhibit consists of three documents, in the following order: 1) a one-page notice, in French, dated February 28, 2011, by the Chief Clerk of the Court of Appeal of Cotonou; 2) an English translation of an Order, dated February 25, 2011, from a Magistrate of the Court of Appeal of Cotonou, releasing the jet to Plaintiff; and 3) an English translation of the first document, which merely indicates that an appeal has been filed. Notably, this "appeal" contains no statements about the ownership of the jet, nor does it indicate whether the jet flight was commercial or private. More importantly, none of the appeal documents was authored by Welkowitz.

In any event, due to the appeal, the jet remained impounded. Plaintiff's insurer then had negotiations with Welkowitz, in which Welkowitz indicated that he would withdraw his appeal if Plaintiff would withdraw the claim for charter costs and expenses that was set forth in Plaintiff's letter dated February 21, 2011. Regarding this offer by Welkowtiz,

---

secured the release of the jet. This same letter suggests that the Beninese attorney who filed the appeal did so based on the direction of Welkowitz's agent in Ghana, without ever speaking to Welkowitz. *Id*. at p. 3 ("On Monday, March 7, the attorney who filed the appeal on behalf of Mr. Welkowitz informed USAU's counsel in Benin that he had been engaged by someone in Ghana who represented himself to be Richard Welkowitz's agent, and that he had never spoken to Mr. Welkowitz."). The letter further suggests that Welkowitz never specifically authorized the appeal. Id. ("[Welkowitz] conceded that he had paid someone in Ghana $153,000 to do whatever was necessary to recover his money from Mr. Padilla. He indicated that he never specifically authorized the appeal.").

Plaintiff contends that, "[s]aid statements by defendant Welkowitz interfered with Plaintiff's possessory rights and falsely cast doubts on the validity of Plaintiff's possessory rights with respect to said aircraft." Proposed Second Amended Complaint ¶ 37.  The Court, though, sees no factual basis for that conclusory statement.  In any event, Plaintiff did not accept Welkowitz's offer.  Nevertheless, on March 17, 2011, Welkowitz withdrew the appeal, and on March 23, 2011, Beninese authorities released the jet to Plaintiff.  However, because of the length of time that the jet had been sitting without maintenance being performed, it was deemed un-flightworthy by U.S. federal aviation officials, which ultimately contributed to the demise of Plaintiff's business.

On December 21, 2011, Plaintiff commenced this action, asserting two causes of action under New York law: conversion and slander of title.  On January 27, 2012, Plaintiff filed an Amended Complaint, asserting the same claims, and seeking approximately $5 million in damages.  Plaintiff subsequently served all Defendants except Padilla.  On March 29, 2012, Plaintiff filed the subject motion [#9] for leave to file a Second Amended Complaint.  In that regard, Plaintiff states that "the proposed pleading omits a number of corporate defendants, expands certain factual allegations, and more specifically identifies Plaintiff's causes of action.  It is respectfully submitted that the balance of the changes are stylistic." Witkowicz Aff. [#9] at ¶ 7.  The proposed pleading still purports to state claims for conversion and slander of title.  Specifically, Plaintiff alleged that Defendants "converted by wrongfully detaining the subject aircraft from Plaintiff's use and operation," and that they "uttered injurious falsehoods and slandered Plaintiff's title with respect to the subject aircraft." Proposed Second Amended Complaint ¶ ¶ 48-49.

On June 8, 2012, Defendants opposed the motion to amend and filed the subject cross-motion [#14] to dismiss for failure to state claim, with prejudice. The application further asks the Court to convert the motion to one for summary judgment, to enforce a subpoena seeking production of a settlement agreement between Plaintiff and its insurer, and to dismiss the action for failure to join the jet's owner as a necessary party, or in the alternative, to join the owner as a party.

On October 18, 2012, counsel for the parties appeared before the undersigned for oral argument. At that time, Plaintiff's counsel argued, *inter alia*, that Defendants' actions in seeking the continued impoundment of the jet were tortious, because Welkowitz knew that Plaintiff owned the jet, and he had "no superior right" to detain the jet.

## DISCUSSION

### *Defendants' Request to Treat the Motion as one for Summary Judgment*

Defendants ask the Court to convert their 12(b)(6) motion to one for summary judgment, and to consider matters outside of the pleadings. However, such request is denied as premature, since Plaintiff has not had any opportunity to conduct discovery. *See, Young v. Benjamin Dev. Inc.*, 395 Fed.Appx. 721, 722-723, 2010 WL 3860498 at *1 (2d Cir. Oct. 5, 2010) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.") (*quoting Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000)). In any event, as discussed further below, it is not necessary for the Court to consider matters outside the pleadings in order to deny the motion to amend and dismiss this action.

*Plaintiff's Motion to Amend and Defendants' Motion to Dismiss*

Courts must freely give leave to amend pleadings "when justice so requires." FRCP 15(a)(2).  Nevertheless, "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir.2009) (citation and internal quotation marks omitted). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Martin v. Dickson*, No. 03-7917, 100 Fed.Appx. 14, 16, 2004 WL 1205185 at *2 (2d Cir. Jun. 2, 2004) (unpublished, citation omitted).

Defendants essentially oppose Plaintiff's motion to amend as futile, and have moved to dismiss under Rule 12(b)(6).  The applicable standard for such a motion is clear:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007 ) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), cert. den. 531 U.S. 1052, 121 S.Ct. 657 (2000).  Significantly, "[h]owever, there is a narrow exception to this rule for factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice." *Perry v. NYSARC, Inc.*, No. 10–5177–CV, 424 Fed.Appx. 23, 25, 2011 WL 2117950 at *2 (2d Cir. May 27, 2011).

*The Pleadings Do Not Plausibly State a Claim for Conversion*

Plaintiff maintains that Defendants committed conversion under the law of New York State, and the elements of such a claim are clear:

> To state a claim for conversion under New York law, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006) (citation omitted).  Put in other terms, a plaintiff must show (1) a "possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id*. at 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citations omitted).  Interference with a plaintiff's right to possession may be "by a wrongful: (I) taking; (ii) detention; or (iii) disposal." *Corporacion Fruticola De Chincha v. Watermelon Depot, Inc.*, 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (*citing Pierpoint v. Hoyt*, 260 N.Y. 26, 29, 182 N.E. 235 (1932)). "Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion." *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S.2d 637, 774 N.E.2d 702 (2002) (citations omitted).

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F.Supp.2d 510, 534 (S.D.N.Y. 2011). "[T]he act of interference may leave the goods physically undisturbed, yet still impair the owner's rights. Courts that state that manual taking is unnecessary do so in order to protect the rights of owners distressed by real, yet intangible, transgressions." *State of New York v. Seventh Regiment Fund*, 98 N.Y.2d at 260. "Wrongful intent is not an element of conversion." *Homkow v. Musika Records, Inc.*, No. 04 Civ. 3587(KMW)(THK), 2009 WL 721732 at *12 (S.D.N.Y. Mar. 18, 2009) (citations omitted). Moreover, a person will be liable for conversion where he uses a third party to interfere with the plaintiff's right of possession. *See, Goldstein v. Guida*, 74 A.D.3d 1143, 904 N.Y.S.2d 117, 118-119 (2d Dept. 2010) (Defendant committed conversion where he hired a third party to remove chairs from the plaintiff's home and deliver them to his upholstery shop, and then denied having received the chairs).

In this action, of course, Defendants did not detain the jet in the first instance, either directly or indirectly. Rather, the Government of Benin detained the jet because it appeared that the jet was used in the commission of a crime. In fact, there does not appear to be any dispute that the jet was used in the commission of a crime, although without Plaintiff's knowledge. However, once the Beninese Court decided to release the jet, Defendant Welkowitz directed that an appeal be filed, which resulted in the continued impounding of the jet.[4] Welkowitz maintains that he appealed the decision because he

---

[4] In opposition to Defendants' motion, Plaintiff suggests that prior to the appeal, Welkowitiz attempted to "importune" Beninese authorities not to release the jet. *See*, Marchionda Aff. [#16] ¶ 17. Such attempts were apparently unsuccessful, since the Benin Court ordered that the jet be released. In any event, Plaintiff has not plausibly pleaded facts to support such a conclusion, or to show that such efforts to "importune" the Beninese authorities prior to the appeal affected the length of time that the jet was held.

was hoping that if the jet was forfeited as part of the criminal action, he could recoup some of the money that Padilla stole from him.  Plaintiff, on the other hand, contends that Welkowitz only filed the appeal in order to gain a bargaining chip, with which he hoped to persuade Plaintiff to agree to release any claims that it might have against him.  In the Court's view, though, Welkowitz's subjective motivation is irrelevant, since the appeal was not tortious in any event.

The alleged conversion occurred, according to Plaintiff, when Welkowitz convinced a third-party court to continue detaining Plaintiff's jet, even though Welkowitz did not presently have any legally recognizable interest in the property.  In that regard, Welkowitz's action was most analogous to the situation in which one seeks the judicial attachment of property, prior to any judgment being rendered, in order to preserve the property.[5]

New York caselaw indicates that wrongfully attaching property, through a court proceeding, may be actionable as conversion. *See, e.g., Day v. Bach*, 87 N.Y. 56, 1881 WL 13044 (1881); *Banken v. Albert*, 25 A.D.2d 184, 268 N.Y.S.2d 36 (1st Dept. 1966); *Siegel v. Northern Blvd. & 80th St. Corp.*, 31 A.D.2d 182, 187, 295 N.Y.S.2d 804, 811 (1st Dept. 1968) ("The second cause of action seeks recovery for injury caused by wrongful attachment.  For such an injury the remedy is an action in conversion or trespass.").  However, the party who obtains attachment of the plaintiff's property will only be liable for conversion where the attachment was procedurally defective, and therefore void or

---

[5] Attachment is defined as "[t]he act or process of taking, apprehending, or seizing persons or property, by virtue of a writ, summons, or other judicial order, and bringing the same into the custody of the court for the purpose of securing satisfaction of the judgment ultimately to be entered in the action. . . . [T]oday the writ of attachment is used primarily to seize the debtor's property in order to secure the debt or claim of the creditor in the event that a judgment is rendered. BLACK'S LAW DICTIONARY, Abridged 5th Ed. (West 1983). Generally, attachment is a creature of state statute. *Id.*

voidable. *See, Banken v. Albert*, 268 N.Y.S.2d at 37-38 ("Plaintiff's contention that the mere filing of an attachment, subsequently vacated, automatically subjects the party who sued out the writ to tort liability as for trespass or conversion, is incorrect.  Such a tort action lies only where the attachment was procedurally defective *Ab initio* and therefore void or voidable.") (citations omitted). Otherwise, the party who obtained the attachment is shielded from tort liability by the court's issuance of the attachment. *See, Day v. Bach*, 1881 W.L. 13044 at *3 ("That cannot be a trespass at the time, which is done by the authority of regular process, duly issued by a court having jurisdiction."); *Bornstein v. Levine*, 7 A.D.2d 843, 843, 181 N.Y.S.2d 653 (1st Dept. 1959) ("[T]he party having first obtained judicial approval, an action in the nature of trespass does not lie.").

Here, the jet was retained pursuant to an order of the Benin Court.  Plaintiff has not alleged that Welkowitz's appeal was procedurally defective under the law of Benin.  Nor has Plaintiff otherwise shown that it was improper for Welkowitz to petition the Benin Government to retain the jet pending the outcome of the criminal investigation.  At most, Plaintiff indicates that at the time, it had assured Welkowitz and the Beninese Government that neither it nor the jet was involved in Padilla's alleged wrongdoing.  The Benin Court eventually agreed with Plaintiff, and ordered that the jet be released, but Welkowitz was apparently entitled by Benin law to appeal the court's determination on that point. Accordingly, Plaintiff has not plausibly stated a claim for conversion.

Nonetheless, Plaintiff argues that as part of Welkowitz's appeal, he made false claims about the ownership of the jet. *See, Bright View Trading Co., Inc. v. Park*, No. 03 Civ. 2330 (HB), 2004 WL 2071976 at *9 (S.D.N.Y. Sep. 16, 2004) ("[A] conversion claim

may lie based solely on [defendant's] alleged misrepresentations in his application for an order of attachment."). However, in light of the documents attached to the Complaint, such conclusory statement is not plausible. In fact, at oral argument, the Court asked Plaintiff's counsel to identify where in the appeal Welkowitz made such misstatements, and he could not do so. As shown by the letter that Welkowitz sent to Benin's President, he did not claim that he owned the jet or had the right to possess it. Instead, he indicated that he was the victim of a criminal scam, and that he would be harmed if the jet were released. Specifically, Welkowitz (and Mandela) stated:

> If the private jet used to carry out the plan which is tangible evidence in the record were to be released while the arrests and prosecutions are still ongoing and the accused are not yet judged, the case would lose its value to our prejudice[.]

Docket No. [#3-1] at pp. 5-6.[6] Plaintiff nevertheless alleges that in Welkowitz's appeal to the Benin Court, he "*again* misrepresented the ownership of the aircraft and the nature of the charter," just as he had in his letter to Benin's President. Proposed Second Amended Complaint at ¶ 33 (emphasis added). However, since the initial letter contained no such misrepresentations, Plaintiff's contention that the appeal contained similar misrepresentations is not plausible.[7] Moreover, no such misstatement is contained in the

---

[6]In opposition to Defendant's motion, Plaintiff argues that, "In this case, the letters [sic] from Welkowitz and his associates to the Court in Benin appended to the complaint provide all that is required to establish interference with plaintiff's possessory interest in the aircraft." Pl. Memo of Law at p. 5. The Court disagrees.

[7]Plaintiff argues that Welkowitz's threats [sic] to sue the Benin government if the aircraft was not held suggests that Welkowitz claimed to own, at least part, the proceeds from the disposition of the aircraft, if not the aircraft itself. . . . Welkowitz intended to, and succeeded in asserting some dominion and control of the aircraft, so as to profit from its forfeiture." Pl. Memo of Law at p. 6. Clearly, though, Welkowitz did not claim to own the jet. To the extent that Welkowitz was concerned about recouping his investment if the jet were forfeited due to its use in Padilla's crime, such interest is similar to a judicial attachment, as the Court has indicated.

actual appeal documents before the Court.  Consequently, Plaintiff's contentions are mere conclusions that are not supported by factual allegations.

Therefore, the Amended Complaint and Proposed Second Amended Complaint fail to state claims for conversion, and the motion to amend should be denied as futile with regard to such claim.

*The Pleadings Do Not Plausibly State a Claim for Slander of Title*

Plaintiff's second cause of action is for "slander of title" under New York law, and the elements of such a claim are clear: "The elements of slander of title are (1) a communication falsely casting doubt on the validity of complainant's title, (2) reasonably calculated to cause harm, and (3) resulting in special damages." *Fink v. Shawangunk Convervancy, Inc.*, 15 A.D.3d 754, 756, 790 N.Y.S.2d 249, 251 (3d Dept. 2005). Moreover, the false statements must be made with at least a "reckless disregard for their truth or falsity." *Id*.  Furthermore, the false communication must render the plaintiff's title "unmarketable in the legal sense" or "tend to cast doubt on the validity of" such title. *Hirschhorn v. Town of Harrison*, 210 A.D.2d 587, 619 N.Y.S.2d 810 (3d Dept. 1994).

In this action, for the reasons discussed above, the Court finds that Plaintiff has not pleaded facts sufficient to plausibly state a claim for slander of title.  In that regard, neither the Amended Complaint nor the Proposed Second Amended Complaint plausibly suggests that Welkowitz or any other Defendant made any communications concerning the ownership of the jet or the validity of Plaintiff's title to the jet.  Accordingly, Plaintiff's application to amend that claim is denied for futility, and the claim is dismissed.

CONCLUSION

Plaintiff's motion to amend [#9] is denied, and Defendants' cross-motion [#14] to dismiss with prejudice is granted. The alternative relief requested by Defendants is denied as moot. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated:     October 31, 2012
           Rochester, New York

                                          /s/ Charles J. Siragusa
                                          CHARLES J. SIRAGUSA
                                          United States District Judge